The STATE of Utah, Plaintiff and Appellee,

v.

Eugene C. REINERS, Defendant and Appellant.

No. 890494–CA.

Court of Appeals of Utah.

Dec. 28, 1990.

Lynn R. Brown, Richard G. Uday (argued), Salt Lake Legal Defender Ass'n, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, State Atty. Gen., David B. Thompson (argued), Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Before GARFF, JACKSON and NEWEY,[1] JJ.

JACKSON, Judge:

Eugene C. Reiners (Reiners) appeals his jury conviction of two counts of sodomy upon a child (J.K.), a first-degree felony in violation of Utah Code Ann. § 76–5–403.1 (Supp.1989), and two counts of aggravated sexual abuse of a child (J.K.), a first-degree felony in violation of Utah Code Ann. § 76–5–404.1 (Supp.1989). We reverse and remand for a new trial.

Reiners raises four basic issues on appeal: (1) the trial court's failure to comply with the requirements of Utah Code Ann. § 76–5–411 (Supp.1989) in admitting the child's out-of-court statements; (2) error in denying motions to dismiss based on the State's failure to provide more specific dates and times of the offenses charged; and (3) erroneous jury instructions.[2]

## FACTUAL BACKGROUND

Reiners was a cab driver known by the name of "Santa Claus." He had a daily "school run" during the 1986–87 school year in which he drove a number of young children to school, including four-year-old J.K., the alleged victim. J.K. attended a school for the deaf and visually impaired. In February 1987, J.K.'s mother found that he had a red bottom. She took him to Primary Children's Medical Center, where he was examined. Later, J.K. spoke with Detective Damewood and Duane Johnson, a social worker at Primary Children's Medical Center. On direct examination before the jury, J.K. said that Santa (identifying Reiners) would take him to the "North Pole," where Santa and three other adults would engage J.K. in several different forms of sexual games. J.K. also indicated that Santa Claus (identifying Reiners) used various types of physical abuse and intimidation to gain his cooperation in their games. He said that sometimes his schoolmates were involved in the games. Thereafter, Damewood and Johnson were permitted to testify to the jury that J.K. had told them similar stories during pre-trial interviews.

### I.

We first examine whether the trial court erred in admitting through Damewood and Johnson the child's out-of-court assertions.

### A. ADMISSIBILITY OF CHILD'S OUT–OF–COURT ASSERTIONS

We are required to apply the following statute:

(1) Notwithstanding any rule of evidence, a child victim's out of court statement regarding sexual abuse of that child is admissible as evidence though it does not qualify under an existing hearsay exception, if:

(a) the child is available to testify in court or as provided by Subsection 77–35–15.5(2) or (3);

(b) in the event the child is not available to testify in court or as provided

---

1. Robert L. Newey, Senior Juvenile Court Judge, sitting by special appointment pursuant to Utah Code Ann. § 78–3–24(10) (Supp.1990).

2. Reiners also claims that there was insufficient evidence to sustain convictions of four offenses, two of sodomy and two of aggravated sexual abuse. At the end of the State's evidence, Reiners made a motion that one count of each type of offense be dismissed for lack of evidence. The trial court denied the motion. We decline to rule on this issue. Rule 24(a)(9) of the Utah Rules of Appellate Procedure requires that the argument section of a brief contain the contentions and reasons of the appellant with respect to the issues presented, with citations to supporting authorities. Reiners' one page "Insufficient Evidence" argument contains no citations to authorities and only vague reasoning. Thus, we decline to rule on this issue. A brief must contain some support for each contention. State v. Wareham, 772 P.2d 960, 966 (Utah 1989).

by Subsection 77–35–15.5(2) or (3), there is other corroborative evidence of the abuse; or

(c) the statement qualifies for admission under Subsection 77–35–15.5(1).

(2) Prior to admission of any statement into evidence under this section, the judge shall determine whether the interest of justice will best be served by admission of that statement. In making this determination the judge shall consider the age and maturity of the child, the nature and duration of the abuse, the relationship of the child to the offender, and the *reliability of the assertion and of the child.*

(3) A statement admitted under this section shall be made available to the adverse party sufficiently in advance of the trial or proceeding, to provide him with an opportunity to prepare to meet it.

(4) For purposes of this section, a child is a person under the age of 14 years.

Utah Code Ann. § 76–5–411 (Supp.1989).[3]

In *State v. Nelson,* 725 P.2d 1353 (Utah 1986), our supreme court provided for a comprehensive inquiry pursuant to the language now in subsection (2) of the statute. The pronouncements of *Nelson,* although set forth in an extensive footnote, have been recognized in two recent cases, *State v. Lamper,* 779 P.2d 1125, 1129 (Utah 1989), and *State v. Van Matre,* 777 P.2d 459, 463 (Utah 1989). *Nelson* analyzes the statute as follows:

> Before out-of-court statements by a child can be admitted for the truth of the matter asserted, they must satisfy not only the alternative tests set out in subparts (1) and (2) of subsection 76–5–411(1), but also the test contained in the last two sentences of 76–5–411(1).[4] At the time of defendant's trial, those two sentences read as follows:
>
> > Before admitting such a statement into evidence, the judge shall determine

whether the general purposes of the evidence are such that the interest of justice will best be served by admission of the statement into evidence. In addition, the court shall consider the age and maturity of the child, the nature and duration of the abuse, the relationship of the child to the offender, the *reliability of the assertion,* and the reliability of the child witness. . . .

*Nelson,* 725 P.2d at 1355–56 n. 3 (emphasis added).

*Nelson* states that the above factors are intended to prompt a comprehensive inquiry into all the circumstances surrounding the child's out-of-court statement in order to determine its reliability, and mandates an in-depth evaluation of the proposed testimony. *Id.* To determine reliability of out-of-court assertions, the trial court should consider timing, spontaneity, questions asked, repetitions and rehearsals, and whether the assertions are reproduced verbatim in court. *Id.* Finally, *Nelson* requires findings and conclusions on all factors that explain the court's reasons for admitting or excluding the hearsay testimony. *Id.*

## B.  RECORD OF CHILD'S OUT–OF–COURT STATEMENTS

The record indicates that J.K. made out-of-court statements about abuse first to his mother and Detective Damewood, and then to Duane Johnson, a social worker. In February 1987, J.K. complained to his mother that his bottom hurt. She examined him and noted that he had a red bottom. He did not say anything except that he was scared. Later, she had him examined at Primary Children's Medical Center. Nothing regarding that physical exam appears in the record. On March 30, 1987, Detective Damewood questioned J.K. but obtained no responses regarding abuse.

---

**3.**  The statute was amended in 1990 to substitute parts of Rule 15.5 of the Utah Rules of Criminal Procedure in place of the references to former Utah Code Ann. § 77–35–15.5 (Supp.1989), now repealed.

**4.**  These two sentences are set forth in Utah Code Ann. § 76–5–411(2) (Supp.1989).

On April 1, 1987, Damewood again met with J.K., who was not responsive. Damewood actively involved J.K.'s mother in role-playing with J.K. She role-played J.K., and J.K. role-played "Santa Claus." After she prompted and scolded J.K. and asked him what Santa had done with his penis, J.K. grabbed his own genital area.

Damewood considered J.K. to be a highly imaginative child with mental impairment and referred him to Duane Johnson, a social worker. Through the use of dolls, J.K. described to Johnson various forms of sexual behavior with "Santa Claus" and "Uncle Patch" and photography by a "cameraman." We note that the foregoing "details" are taken from hearsay testimony admitted at trial. Six months later, Johnson again interviewed J.K. and videotaped that interview.

Several months before trial, the State provided Reiners with a report of Johnson's first interview, a copy of the videotape of Johnson's second interview, and a report by Damewood about his two interviews. The written reports of Damewood and Johnson are not in the record, nor does the record indicate that they were ever seen by the trial court. The videotape was not provided to the trial court and is not part of the record on appeal. Thus, we conclude that neither the written reports nor the video of the child's out-of-court statements were part of the trial court's admissibility evaluation.

## C. PROCEDURE RE CHILD'S OUT-OF-COURT STATEMENTS

As the trial began on March 6, 1989, Reiners renewed a previous motion to dismiss based on the lack of specific dates, times and places in the information. The trial court denied his motion. Then the prosecutor made a motion, summarized as follows: "I have a motion to indicate I intend to call Duane Johnson, a social worker who interviewed the boy. The defense has viewed the video. Johnson's testimony of the child's out-of-court statements is offered pursuant to section 76–5–411 as corroboration of the boy's testimony and will show consistency in the child's statements, and we ask the court to determine whether the hearsay evidence will be in the best interest of justice."

Reiners resisted the motion, arguing lack of advance notice under the statute and the necessity of foundational findings and conclusions as required by *Nelson*. The trial court overruled Reiners' objection to the prosecutor's motion, and the following procedural discussion ensued:

THE COURT: So what are we going to do now, go in and get the jury?

MR. VUYK [for the State]: I think we can get the jury. And prior to putting Duane Johnson on, I'll prepare the findings and have them for you.

MR. HEWARD [for Reiners]: Will there be any evidentiary hearing to the court to make those findings?

MR. BROWN [for Reiners]: You mean the court is prepared to sign findings on it now?

THE COURT: No. I would not sign findings. But I would be listening. What are you asking?

MR. BROWN: Well, we are asking that it should have been done three days ago.

THE COURT: That's over with. What are you saying now?

MR. BROWN: I guess it's up to Mr. Vuyk how he wants to handle that now.

THE COURT: We are either going to have an in camera hearing as far as putting any testimony on, or we are going to allow you to proffer and I'll make my findings.

MR. BROWN: I would object to any proffer.

THE COURT: Okay. Then what are you asking for?

MR. BROWN: I'd ask for an evidentiary hearing on that.

MR. VUYK: I'd indicate to the Court that we are going to put the boy on first.

You'd have that evidence before you with reference to the boy. And I could then bring in Dr. Johnson and he could speak before that time about how the situation was taken and whether it was reliable or not.

THE COURT: Then let's proceed that way. And I'll see what the testimony of the boy is and see what we need as far as an evidentiary hearing.

Pursuant to that ruling, J.K. was examined in the presence of the jury. Then J.K.'s mother testified. During her testimony, she was asked what the boy had told her about his abuse. Reiners objected to the question and requested a side bar conference.

The trial court excused the jury to permit additional argument. Again, Reiners objected:

MR. BROWN: Well, your Honor, we would object to it based on the record we made this morning before the court started.

THE COURT: I ruled on the admissibility, counsel.

MR. BROWN: I would like to raise that again.

THE COURT: Your objection is noted, so don't go into it. That my only concern now is what you want as far as findings of fact pursuant to 76–5–411.

[additional argument regarding findings]

THE COURT: I guess the argument is over and the Court ... will give its ruling.

Of course we did have this matter argued earlier today and put it on the record. And the Court is referring of course to Section 76–5–411 which concerns the admissibility of out-of-court statements made by a child victim of sexual abuse to a person outside the courtroom. And there are certain requirements that the Court must find in order to allow that testimony.

The Court this morning did overrule the objection of the defense to the testimony. But I did indicate that the Court would require that testimony be put on to prove the requirements so the Court could make the findings concerning it.

So the Court does find that, in the interest of justice, that the child is a child, as has been testified to, of the age of seven years. The child is not a mature individual but the child does seem fairly alert, fairly reliable for a child of seven years. He is fidgety. He is here and there, the way most seven-year-old children would be.

You could tell he had some trouble as far as his eyes were concerned. You could tell that his mind would wander sometimes. And you could tell that some statements, some words could be put into his mouth, so to speak.

But the child, himself, on most situations answered the questions without being led. It was only when he was being led that the Court had any question as far as his reliability was concerned. But when he was testifying on his own from direct statements, that his testimony appeared to be reliable.

And the Court does not find that—the jury of course naturally is the one that's going to have to decide what they believe as far as that's concerned. But as far as this compliance with Section 411, the Court does find that the testimony of the child was reliable.

The Court would find that the duration of the abuse was over a period of time. That as counsel for the defense did lead him on that, the boy did make statements which would cause some concern. And that's what the jury is going to have to decide for themselves on that. But it was not sufficient for the Court to throw out that testimony.

The Court does find that the relationship with the alleged offender was one of trust, one of confidence. That he was called Santa Claus to him. He was taken to the North Pole. He testified as to different individuals of which the child may have had some faith or confidence

in. So there was an area of trust or reliability as far as the relationship between the child and the alleged offender.

Now, I think that that is all the Court is required to find, unless counsel, as I read the statute, can see anything further.

As indicated hereafter, a recess was taken after further discussion. The court reporter prepared a transcript of the above oral ruling which was signed by the trial court as its findings and conclusions regarding the admission of the child's out-of-court assertions.

Further discussion between the court and counsel ensued. Reiners objected to any testimony of out-of-court statements by J.K. to his mother because statements to her had been set forth only in Damewood's report and, as to her testimony, that report was fragmentary. The State submitted the matter based on the police report. Thereupon, the court ruled:

THE COURT: Well, the Court is going to rule this way: I would deny your right to proceed as far as the interrogation of this individual [J.K.'s mother] on this subject. I would allow you, upon your bringing in—is it the social worker or the doctor—of where the statements, he made the statements to him of what were provided. And after that is in evidence, and also the fact that the mother's statements are in the police report, then I would allow you, if you wish to do so, choose to do so, to bring back the mother to give the statements. But at this time I would grant their motion to deny the admissibility of hearsay testimony through the mother until further evidence is in.

The above ruling was not reduced to writing as part of the court's findings and conclusions. The court and counsel engaged in additional discussion of the *Nelson* requirements and then the recess was taken so the reporter could prepare the prior ruling for the court's signature as its findings and conclusions, as indicated above. Thereafter, J.K.'s mother resumed the witness stand. She did not testify about any hearsay assertions of abuse by J.K. The State's next witness was Damewood. He testified regarding some out-of-court assertions from J.K. obtained in the second of two interviews during role-play by J.K. and his mother.[5]

Duane Johnson was then sworn in and began testifying before the jury. Within moments, the State asked him to relate what J.K. had said to him. Again, Reiners

---

**5.** Questioning of Damewood during trial:

Q. Who did you finally get your details from?

A. I was given some information again by [J.K.'s mother] and by Mr. Chapman. There were subsequent psychological tests done also that I was made aware of.

Q. Now, in your report, was there a time when you had some role-playing with J.K. and his mother?

A. We attempted to in one of the interviews, in the second interview on April 1st. [Mrs. K.] assisted that after we initially tried to talk to [J.K.] and he was unable to answer. Then [Mrs. K.] assumed that position of a role model.

Q. Which was she playing, which role?

A. We had [Mrs. K.], by her own arrangement, had her represent [J.K.].

Q. And who did [J.K.] represent?

A. [J.K.] represented the man we referred to as Santa.

Q. What came out of that role-playing?

A. There was some playing that didn't appear to relate to my investigation. I remember that [J.K.] would hit his mother throughout this time, that there was a lot of hitting especially in response to specific questions. [Mrs. K.] asked him what Santa did with his peepee and [J.K.] responded by grasping his own lower pelvic region on top of his clothing.

Q. Anything else that you remember specifically?

A. He mentioned putting, how Santa would put his finger in [J.K.]'s mouth and make him throw up.

Q. Anything else?

A. At that time he simulated first a still photography where he would be taking pictures. And it seems to me he made some kind of clicking sounds. And later we asked if there were other kinds of pictures, and he simulated using a telescope. And we never clarified that specifically.

Q. Anything else?

A. That's all I recall at that time.

objected based on prior arguments. The court responded: "And based on that, the Court would overrule the objection." Johnson then testified to numerous out-of-court statements made to him by J.K. in his two interviews.

### D. TRIAL COURT'S EVALUATION OF CHILD'S OUT–OF–COURT STATEMENTS

The trial court's admissibility evaluation failed to comply with the requirements of the section 76–5–411 and *Nelson* in several ways. *First,* the court's initial ruling at the beginning of trial was based solely on the arguments and representations of counsel. The court did not know the content of the out-of-court statements or evaluate their reliability before ruling. The court did not evaluate, before ruling, the reliability of the child as a witness in the context of a four-year-old making the statements to others out of court. The ruling was not supported by findings of fact or conclusions of law. *Second,* the court's further ruling after the child testified to the jury also lacks proper foundation. That evaluation of the child's out-of-court assertions is based on the child's *in-court assertions.* Again, the court did not receive the earlier assertions to Damewood and Johnson or evaluate their reliability. Further, the court focused solely on the reliability of J.K. as a trial witness to the exclusion of the reliability of the proffered testimony. *Third,* although some findings were pronounced in an effort to rehabilitate the ongoing rulings of admissibility, those findings reflect the court's focus on the witness at trial and not at the time of his prior assertions. The findings under section 76–5–411(2) are to focus on the trustworthiness and reliability of the out-of-court statements. *Lamper,* 779 P.2d at 1129. The court did make belated written findings (in the transcript of the oral ruling), albeit cursory and conclusional, regarding age, maturity, nature and extent of abuse, relationship to offender, and reliability of the child as a witness. The court ruled

that the proffered assertions, which at that point in the proceedings were unseen and unheard by the court, were admissible. This approach does not pass statutory muster because the court did not rule on the reliability of the child's out-of-court assertions to Damewood and Johnson as required by section 76–5–411(2).

*Fourth,* the court did not make the mandatory in-depth evaluation of the proposed hearsay testimony as required by *Nelson,* 725 P.2d at 1356 n. 3:

> In any case involving a proffer of hearsay statements by a child victim, the trial court *must* make an in-depth evaluation of the proposed testimony as required by subsection 76–5–411(1) [now (2)]. This inquiry may require consideration of some matters not specifically mentioned in the statute. For example, to determine the reliability of the statement, a court should consider how soon after the event it was given, whether the statement was spontaneous, the questions asked to elicit it, the number of times the statement was repeated or rehearsed, and whether the statement is reproduced verbatim in court, *viz.,* tape recording, video tape, or otherwise.

We find the above matters relevant and germane to the determination of admissibility in this case and now evaluate in turn the trial court's action regarding them:

(a) How soon after the event was the statement given? Here, the time of the events could not be identified any closer than "during the 1986–1987 school year". In February 1987, J.K. reported his red bottom to his mother. Damewood conducted the role-playing interview on April 1, 1987. Johnson conducted another interview on April 28, 1987 and the video interview six months later. These time factors were not evaluated by the trial court.

(b) Was the statement spontaneous? Only J.K.'s red bottom report to his mother appears to have been spontaneous. Damewood's two interviews produced nothing until J.K.'s mother engaged in role-playing,

which resulted in J.K. grabbing his own genital area when asked what Santa had done. More detailed assertions came in Johnson's interviews, after the mother had failed to adduce any, and after Damewood twice failed before seeking the mother's intervention, which yielded little. These spontaneity factors were not evaluated by the trial court.

(c) What questions were asked to elicit the assertions? The record is silent about the content and frequency of questions asked by the mother. The reports of Damewood and Johnson were not made available, nor was Johnson's video. Thus, the only information in the record regarding "questioning" of J.K. is contained in the hearsay testimony from Damewood and Johnson. But, that information was obtained only after the court had already ruled the hearsay admissible. The questions factor was not evaluated by the trial court.

(d) How many times was the statement repeated or rehearsed? The primary assertions were apparently repeated twice to Johnson. Was the second a rehearsal? The factors of rehearsal and repetition were not considered by the trial court.

(e) Was the statement repeated verbatim in court, *viz.*, in a tape recording, video tape, or otherwise? J.K.'s out-of-court assertions were not presented verbatim to the court; they were never presented to the court. The trial court did not consider this factor before ruling.

*Fifth*, the trial court's findings are fatally flawed and the necessary conclusions of law are nonexistent. Only when all of the above steps are taken can a defendant be assured that the statutorily required approval has been made. Further, only when such steps are taken can this court properly perform its appellate review functions. *Nelson*, 725 P.2d at 1356 n. 3.

Thus, we hold that since the trial court failed to follow the mandates of the statute and *Nelson*, its rulings admitting the child's hearsay statements through Damewood and Johnson were erroneous as a matter of law.

II.

Finally, we must consider whether the trial court's erroneous rulings resulted in harmful error. An error is harmful when there is a reasonable probability that absent the error, the outcome would have been more favorable for the defendant. *Lamper*, 779 P.2d at 1129. In *Lamper*, the lack of reliability and trustworthiness findings was not harmful because the necessary evaluation was performed under the analogous requirements of Utah Code Ann. § 77–35–15.5(1)(g) (Supp.1989) (repealed effective July 1, 1990). *Id.* In addition, the evaluation was based on a two-day hearing where four witnesses testified and the court and counsel viewed the video. Here, no separate hearing was held, and the court did not view the video or examine the written reports. The court evaluated in-trial testimony rather than the out-of-court statements themselves.

We believe that without the bolstering of the child's in-court testimony by the hearsay testimony admitted through Damewood and Johnson, there was a reasonable probability that the jury would not have believed the child's stories. The trial court noted that J.K.'s mind would wander, that some words could be put in his mouth, and that he was susceptible to being led. The court expressed concern about these matters, but left the decision up to the jury. Thus, the court made the issue one of credibility, not admissibility. The State said the hearsay testimony was offered to show consistency. But, as Reiners argues, there were significant inconsistencies between the in-court and out-of-court statements as to people, places, things, and events. Further, Johnson repeatedly stated that his "responsibility" was to try to determine the actual credibility of the child's statements. He implicitly found J.K.'s stories credible, al-

though he did not render a direct opinion on credibility.[6]  *Cf. State v. Rimmasch*, 775 P.2d 388 (Utah 1989).

Significantly, the record is devoid of any physical or psychological evidence of abuse or regarding the people, places, things, and events the child said he observed while being abused, except his mother's statement that his bottom was red.  No other children or adult participants were ever located, although the child described them as being there on more than one occasion.  He described the exterior and interior of the lonely house where the events took place, but no house was ever located.  Reiners lived in a busy apartment complex with his wife, the exterior and interior of which have no resemblance to the child's descriptions.

We think the procedures employed by the trial court impaired Reiners' defense.  Although we will not reach Reiners' timeliness argument concerning the court's at-trial evaluation procedures, there was some adverse impact from lack of pretrial notice and findings that the hearsay would and could be used.  Also, the State was not timely in responding to the court's ongoing order to be more specific regarding dates, times, and places of the abuse, which hindered Reiners in meeting the generic accusations.  Accordingly, we find that absent the error in admitting the hearsay testimony through Damewood and Johnson, there is a reasonable likelihood of a result more favorable to Reiners.

The convictions must be reversed, and the matter remanded for retrial.  In view of our ruling, we find it unnecessary to reach the remaining issues.

GARFF and NEWEY, JJ., concur.

6.  The State argued to the jury:
    His [Johnson's] sole concern was to see if there was abuse, and to see if it was credible.  And he told you how many times that was the purpose, to see if the child was credible and he told you what J.K. told him.