2005 UT App 436

**Robert HAUPT, Plaintiff and Appellant,**

v.

**David O. HEAPS, Defendant and Appellee.**

No. 20040296–CA.

Court of Appeals of Utah.

Oct. 14, 2005.

Allen K. Young, Young Kester & Petro, Provo, and Jonah Orlofsky, Chicago, Illinois, for Appellant.

Evan A. Schmutz, William Kelly Nash, and Curtis R. Hussey, Hill Johnson & Schmutz, LC, Provo, for Appellee.

Before DAVIS, McHUGH, and THORNE, JJ.

OPINION (For Official Publication)

McHUGH, Judge:

¶ 1 Robert Haupt appeals from a jury verdict in favor of Defendant David Heaps on Haupt's complaint for common law fraud. Haupt filed this appeal, claiming that the trial court erred by excluding certain evidence and by incorrectly instructing the jury. We affirm.

## BACKGROUND

¶ 2 Authorize.Net was established in 1996 to provide Internet merchants with the ability to process online credit card transactions. Although such transactions are routine today, at that time credit card processing over the Internet was a new concept.

¶ 3 Authorize.Net hired Robert Haupt in 1997 on a contract basis to develop a computer program that would allow Authorize.Net to process the online credit transactions. In March of 1997, Haupt became a full-time employee of Authorize.Net and was given 75,000 shares of the company's common stock. At about this same time, David Heaps was hired as Authorize.Net's Chief Executive Officer and was also given 75,000 shares of the company's common stock.

¶ 4 Haupt resigned from Authorize.Net on May 1, 1998, but did not dispose of his shares of the company at that time. In the summer of 1998, Heaps began contacting Haupt and other shareholders to inquire whether they would voluntarily relinquish some of their shares back to Authorize.Net. Heaps represented that the company needed to restructure stock ownership to attract outside investors. Haupt refused to relinquish his stock.

¶ 5 Sometime later, in August or September 1998, Haupt contacted a representative of Authorize.Net and offered to sell his shares of the company for $12,000. Haupt alleges that he made the decision to sell his shares at that price because Heaps and other company officials told him that Authorize.Net was on the verge of collapse and that without an immediate infusion of outside capital the company would fail. Authorize.Net's Board of Directors met on September 10, 1998, and voted unanimously to purchase Haupt's shares for $12,000.

¶ 6 On September 30, 1998, Heaps arranged to meet with Haupt and his accountant, Mr. Bigler, to finalize the agreement. At Haupt's request, Heaps brought with him certain financial information about the company's performance. The financial reports provided related only to the first and second quarters of 1998. There is no dispute that the financial information was reviewed by Bigler and Heaps and that it showed Authorize.Net was operating at a small profit and experiencing growth.

¶ 7 After reviewing the documents with his accountant, Haupt executed a Stock Relinquishment Agreement (Agreement). The Agreement contained a standard merger clause representing that the written document contained the entire agreement of the parties; a waiver of all claims against the company and its officers, directors, and employees; and a provision acknowledging that Haupt had been given sufficient opportunity to receive and review all pertinent documents relating to Authorize.Net's past history, current status, and future prospects.

¶ 8 On July 1, 1999, approximately nine months after Haupt sold his stock to the company for $12,000, Authorize.Net merged with Go2Net, a publicly traded company. At the time of the merger, the value of each share of Authorize.Net was estimated by Go2Net to be between $90.00 and $96.00.[1]

¶ 9 Haupt initiated the present action against Heaps, Authorize.Net, and an officer of the company, Jeffrey Knowles. Haupt claimed that he had been defrauded into selling his stock to the company at an artificially low price due to the misrepresentations about the imminent financial collapse of Authorize.Net. Before trial, Haupt settled with the other defendants and this matter was tried before a jury on a theory of common law fraud against Heaps. The jury found in favor of Heaps. The special verdict form shows that although the jury concluded Heaps had made material misrepresentations to Haupt, it also found that Haupt did not reasonably rely on the false or misleading statements or omissions of material fact. Haupt filed this appeal.

¶ 10 Haupt claims that the trial court committed reversible error by (1) refusing to admit a Form 8–K/A filed with the Securities and Exchange Commission (SEC) by Go2Net one year after the sale of Haupt's stock, (2) excluding certain expert testimony, and (3) improperly instructing the jury.

## ISSUES AND STANDARDS OF REVIEW

¶ 11 We review the admissibility of evidence for an abuse of discretion. *See E.B. v. State*, 2002 UT App 270, ¶ 10, 53 P.3d 963. Determinations as to who qualifies as an expert witness and the admission of the witness's testimony fall within this discretion, *see id.*, as does the admission of documentary evidence, *see Jensen v. Intermountain Power Agency*, 1999 UT 10, ¶ 12, 977 P.2d 474. Trial courts are "in the best position to assess the credibility of witnesses and to derive a sense of the proceeding as a whole," *State*

*v. Pena*, 869 P.2d 932, 936 (Utah 1994), and we will not reverse a trial court absent a clear abuse of discretion, *see E.B.*, 2002 UT App 270 at ¶ 10.

¶ 12 Whether the trial court properly instructed the jury is a legal determination that we review for correctness. *See Jensen*, 1999 UT 10 at ¶ 16. We examine the challenged instruction in context. *See id.* "[I]f the jury instructions as a whole fairly instruct the jury on the applicable law, reversible error does not arise merely because one jury instruction, standing alone, is not as accurate as it might have been." *Id.* (quotations and citation omitted).

## ANALYSIS

### I. Exclusion of Exhibit 96

■ ¶ 13 Haupt contends that it was reversible error for the trial court to exclude Exhibit 96, a Form 8–K/A filed with the SEC by Go2Net on September 10, 1999, approximately one year after the sale of Haupt's shares to Authorize.Net. Haupt argues that the trial court should not have evaluated the 8–K/A under the test set forth by the Utah Supreme Court in *State v. Rimmasch*, 775 P.2d 388, 397–99 (Utah 1989), because it is a historical document that should have been admitted under rule 401 of the Utah Rules of Evidence.[2] Haupt oversimplifies the analysis.

¶ 14 The trial transcript indicates that the trial court excluded Exhibit 96 under rule 403 of the Utah Rules of Evidence, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Utah R. Evid. 403. The Form 8–K/A was filed several months after the merger with

---

1. The parties disagree about the price per share at the time of the merger. Haupt claims that the price was $96.00 per share, while Heaps alleges it was $90.00 per share.

2. Rule 401 provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401.

Go2Net and one full year after the sale of stock by Haupt that was the subject of the fraud allegations. The financial statements attached to the Form 8–K/A were audited by KPMG, an international accounting firm. Those financial statements include a footnote that applies a Straight–Line Ramp–Up Method (SLR Method) to determine the amount of expense to the company that should be included for the sale. None of Haupt's experts was familiar with the SLR Method and no one from KPMG was offered to explain its use in the footnote. Furthermore, the trial court had previously ruled that

> the proper measure of damages is the difference between the price paid by a third party for the stock on July 1, 1999 and the price that was paid by defendant for the stock on September 30, 1998. Both of those numbers are known and do not require the analysis of the KPMG financial documents.

The trial court concluded that the decision on the proper measure of damages rendered the SLR Method valuation in the Form 8–K/A moot.[3] It then found that it was not probative for any other purpose.[4] Under the facts of this case and considering the wide discretion afforded the trial court in weighing the probative value against the potential for prejudice, we affirm the exclusion of Exhibit 96. *See State v. Hobbs,* 2003 UT App 27, ¶ 28, 64 P.3d 1218 (upholding exclusion under rule 403 of witnesses offered to show victim's dishonesty because of waste of time and potential for confusion); *State v. Vigil,* 922 P.2d 15, 27–28 (Utah Ct.App.1996) (upholding exclusion under rule 403 of testimony comparing state-licensed adoption agencies to adoption services provided to defendant because of propensity to confuse or mislead jury).

## II.  Admissibility of Expert Testimony

¶ 15 Haupt also claims the trial court committed reversible error in excluding the testimony of his experts, Dr. Paul Randle, Mr. Curtis Bramble, and Professor William Steven Albrecht. After reviewing the excluded evidence, we disagree.

### A.  Dr. Paul Randle

¶ 16 Haupt sought to introduce the testimony of Dr. Paul Randle, an economist who was prepared to testify as to the value of the Authorize.Net stock in September 1998 when Haupt sold his shares back to the company. Randle's valuation, however, was based upon the Form 8–K/A dated September 10, 1999, and prepared by KPMG. Specifically, Randle relied on the SLR Method found in a footnote to the financial statements attached to the 8–K/A. The SLR Method plots the known value of the stock at a point in June 1997 and the known value when the company was merged with Go2Net in June 1999. It then draws a line between those two points and assumes that the value of the stock changed at a consistent rate between those two data points. By making the assumption that the value of the stock increased at a steady rate with no variation based on actual events, a value can be assigned for any date between the two points.

¶ 17 Randle did not perform his own valuation of the Authorize.Net stock. Instead, he simply adopted the value arrived at under the SLR Method used by KPMG. Despite his many years as an economic expert, Randle admitted that he had never seen the SLR Method of valuation prior to reviewing the 8–K/A filed by Go2Net. He also testified that he did not consider the SLR Method to be a valuation method. Nevertheless, Haupt sought to introduce testimony from Randle opining as to the value of the stock in September of 1998 based on the SLR Method.

¶ 18 Rule 702 of the Utah Rules of Evidence provides the basic parameters for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

---

3.  The trial court's ruling on the proper measure of damages is not challenged on appeal.

4.  The trial court allowed Haupt to introduce a redacted version of Exhibit 96 that did not contain the SLR Method analysis.

Utah R. Evid. 702. The trial court concluded that the testimony based upon the SLR Method was novel scientific evidence that must be evaluated under the test adopted by the Utah Supreme Court in *State v. Rimmasch*, 775 P.2d 388, 397–99 (Utah 1989). A reliability standard is necessary because

> [w]hile often helpful, scientific testimony also has the potential to overawe and confuse, and even to be misused for that purpose. Consequently, jurisprudential history reveals a consistent attempt to ensure the reliability and helpfulness of evidence while allowing a maximum of relevant information to flow to the finder of fact.

*Alder v. Bayer Corp.*, 2002 UT 115, ¶ 56, 61 P.3d 1068.

■■■ ¶ 19 A *Rimmasch* analysis is "inapplicable where there is no plausible claim that the type of expert testimony offered by the prosecution was based on novel scientific principles or techniques." *Id.* at ¶ 59 (quotations omitted). If, however, the reliability of the underlying principles offered by the expert can be reasonably questioned, judicial notice is not appropriate and the party offering the testimony has the burden of establishing its inherent reliability. *See id.* Testimony not found to be inherently reliable may not be admitted.

¶ 20 Haupt argues that Randle's testimony was not based upon either "novel" or "scientific" principles or techniques and thus should not have been evaluated under the *Rimmasch* test. Haupt contends that it is not unusual for an economic expert to rely on audited financial statements and that economic testimony is not scientific. Consequently, Haupt argues that the trial court erred in excluding Randle's testimony under *Rimmasch.*

■■■ ¶ 21 The testimony based on the Form 8–K/A is novel when used as a valuation tool. Indeed, Haupt's own experts confirmed that the SLR Method is novel. Randle obtained his Masters of Business Administration in 1967 and has been actively involved in the fields of economic theory and business valuation since that time. He has authored numerous articles in his field, taught at the university level, and been designated as an expert on forensic economics in numerous legal proceedings. Despite this impressive experience and training, Randle had never seen the SLR Method used as a valuation tool and did not recognize it as such. The trial court did not abuse its discretion in concluding that the SLR Method was novel.

¶ 22 Whether economic expert testimony is scientific is more problematic and highlights the differences between the Utah and federal standards for admitting expert testimony. Four years after *Rimmasch* was decided, the United States Supreme Court joined the Utah Supreme Court in recognizing the need for trial courts to carefully regulate the admissibility of scientific evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[5] Subsequently, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court held that the federal *Daubert* reliability analysis applies to all expert testimony offered under rule 702 of the Federal Rules of Evidence,[6] whether or not that testimony is considered "scientific." In reaching that conclusion, the *Kumho Tire* Court acknowledged that:

> [I]t would prove difficult, if not impossible, for judges to administer evidentiary rules

---

5. Later, in *State v. Crosby*, 927 P.2d 638 (Utah 1996), the Utah Supreme Court compared the federal standard announced in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to the *Rimmasch* standard and concluded that while the two standards have similar goals, the *Rimmasch* standard is more restrictive and requires the trial court to " 'carefully explore each logical link in the chain that leads to expert testimony.' " *Crosby*, 927 P.2d at 642 (quoting parenthetically *State v. Rimmasch*, 775 P.2d 388, 403 (Utah 1989)). The *Crosby* court rejected the more flexible *Daubert*

standard in favor of the three-part *Rimmasch* analysis, noting that *Rimmasch* provided a "detailed and rigorous outline for trial courts to follow when making determinations concerning the admissibility of scientific evidence." *Id.*

6. Utah Rule of Evidence 702 and Federal Rule of Evidence 702 are identical. *See* Utah R. Evid. 702 advisory committee's notes. We note, however, that Utah Rule of Evidence 702 is under consideration by the Utah Supreme Court Advisory Committee on Evidence and may be revised.

under which a gatekeeping obligation depended upon a distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. There is no clear line that divides the one from the others. 526 U.S. at 148, 119 S.Ct. 1167.

¶ 23 Since the decision in *Kumho Tire*, the Utah Supreme Court has reiterated that the *Rimmasch* test "applies only to novel scientific methods and techniques." *Alder v. Bayer Corp.*, 2002 UT 115, ¶ 60, 61 P.3d 1068; *see also Green v. Louder*, 2001 UT 62, ¶ 27, 29 P.3d 638; *State v. Adams*, 2000 UT 42, ¶ 16, 5 P.3d 642; *State v. Kelley*, 2000 UT 41, ¶ 19, 1 P.3d 546; *State v. Schultz*, 2002 UT App 366, ¶ 21, 58 P.3d 879. A careful review of the Utah decisions, however, indicates that "scientific" evidence is not narrowly defined to include only evidence developed using principles or techniques found in what are traditionally thought of as the "hard sciences."

¶ 24 In *Rimmasch*, the defendant appealed a conviction for sexual abuse of his daughter on the grounds that the trial court improperly admitted testimony of psychological experts offered by the State. *See State v. Rimmasch*, 775 P.2d 388, 389 (Utah 1989). The defendant challenged the testimony, in part, on the grounds that the experts were allowed to compare the daughter with a typical child abuse victim or profile. *See id.* at 389–90. The Utah Supreme Court adopted the inherent reliability test to determine whether these profiles, which it found to be novel and scientific, should have been admitted. *See id.* at 397–99. Thus, it is apparent that the Utah definition of "scientific" includes, at least, the field of psychology. *Compare id.* (treating testimony of psychological experts as scientific), *with Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167 (refusing to treat testimony of engineer as scientific). We have been unable to find any case in which the Utah Supreme Court has been faced with a situation where, as here, the method is novel but the issue is whether it is scientific. *See, e.g., Green*, 2001 UT 62 at ¶ 27 (concluding that use of computer program by accident reconstructionist not novel); *Adams*, 2000 UT 42 at ¶ 16 (concluding that use of I.Q. tests by psychologist not

novel); *Kelley*, 2000 UT 41 at ¶ 19 (same); *Schultz*, 2002 UT App 336 at ¶ 24 (determining that use of canines by fire department as investigative tool to help detect accelerants not novel). Because the trial court did not limit its analysis to the inherent reliability test, however, we do not resolve whether economic testimony is "scientific" for purposes of *Rimmasch*.

¶ 25 Whether a *Rimmasch* analysis is employed or the expert testimony is considered under the traditional parameters of rule 702, the trial court must consider whether the proffered testimony will be helpful to the trier of fact. "[E]vidence not shown to be reliable cannot, as a matter of law, 'assist the trier of fact to understand the evidence or to determine a fact in issue' and, therefore, is inadmissible." *Rimmasch*, 775 P.2d at 397–98 (quoting Utah R. Evid. 702). Thus, the trial court should evaluate whether the probative value of the proffered evidence is outweighed by its potential for unfair prejudice. In *State v. Larsen*, 865 P.2d 1355 (Utah 1993), the Utah Supreme Court explained the interplay between rules 702 and 403, stating:

> [A]n integral element of a rule 702 determination to admit expert evidence is a balancing of the probativeness of the evidence against its potential for unfair prejudice. This balancing mimics that under rule 403 and is necessary to a determination of "helpfulness."

*Id.* at 1363 n. 12 (citing *Rimmasch*, 775 P.2d at 398 n. 8); *see also State v. Pearson*, 943 P.2d 1347, 1353 (Utah 1997) (concluding that simulation of shots fired from moving car was properly excluded under rule 702 as more prejudicial than probative).

¶ 26 In addition to concluding that Randle's report and testimony did not satisfy the *Rimmasch* inherent reliability standard, the trial court also found that the report and testimony would not assist the trier of fact under rule 702 because they were more prejudicial than probative. In reaching that conclusion, the trial court relied upon Randle's admission that the SLR Method, which formed the basis of his opinion, was one he had never used or seen previously. *See Pearson*, 943 P.2d at 1354 ("The expert in

this case testified that he had never performed a simulation involving shooting from a car before, only simulations with cars alone."). Randle testified that he did not recognize the SLR Method as a valuation technique and adopted the KPMG footnote without any attempt to verify it independently or to investigate KPMG's intent in utilizing it. The trial court expressly found that the SLR Method was "not an accepted method of business valuations" and "had never been used as a business valuations methodology by any of the experts before the [c]ourt, or by any other experts to the knowledge of the parties and their experts." The trial court also found that the SLR Method was "not used by KPMG as a means of conducting a business valuation."

¶ 27 In addition, the trial court's prior ruling on the proper measure of damages, which is not challenged here, made the valuation testimony irrelevant. This is particularly true because the SLR Method was dependent upon events that occurred well after the purchase of Haupt's stock by Authorize.Net. Under these circumstances, the trial court did not abuse its discretion in excluding Randle's testimony under rule 702.

### B. Curtis Bramble

▪ ¶ 28 Haupt also asserts on appeal that the exclusion of the testimony of Curtis Bramble, a certified public accountant, was error. As with Randle, the trial court excluded the Bramble testimony on multiple grounds. Bramble was engaged to opine as to the fair market value of the Authorize.Net stock on the date Haupt sold it to the company, September 30, 1998. In reaching his conclusions in that regard, Bramble relied upon the SLR Method found in the KPMG-audited financial statements of Authorize.Net. Bramble admitted that he had not previously used or seen the SLR Method. The trial court excluded that testimony on the grounds that, under *Rimmasch*, it was based on the inherently unreliable SLR Method. It also concluded, however, that

the Bramble testimony would not be helpful to the jury under rule 702 and was more prejudicial than probative under rule 403. For the same reasons discussed with respect to Randle's testimony, we cannot say that the trial court abused its discretion in excluding the testimony of Bramble based upon the SLR Method.

¶ 29 Haupt also offered testimony from Bramble about the value of Authorize.Net stock on September 30, 1998, which he arrived at by using 1999 stock values. The trial court concluded the valuation technique employed by Bramble failed the *Rimmasch* test. As with the SLR Method, the trial court found that the use of data not available at the time of the critical sale rendered the opinion likely to confuse rather than to help the jury. The trial court also found that the testimony was irrelevant due to the court's prior ruling on the proper measure of damages. While this is a closer question because Bramble performed the analysis himself, we do not think that exclusion of the testimony under the circumstances of this case rose to the level of an abuse of the wide discretion granted the trial court.

▪ ¶ 30 Furthermore, even if Haupt is correct that the September 30, 1998 value was relevant on the issue of whether Heaps misrepresented the value of the stock on that date, the error was harmless. The special verdict form shows that, even in the absence of this evidence, the jury found that Heaps did make material misrepresentations to Haupt. The verdict in favor of Heaps was based on the jury's further conclusion that Haupt did not reasonably rely upon those misrepresentations.[7]

### C. Dr. Albrecht

▪ ¶ 31 Haupt appeals the trial court's exclusion of the testimony of Dr. William Steven Albrecht, which was offered to establish that the facts of this case are consistent with typical elements of fraud. Dr. Albrecht's

---

7. This same analysis is true with regard to the SLR Method testimony and Exhibit 96. The only other purpose of that evidence was to establish that Heaps's statements about the financial condition of Authorize.Net were untruthful and made to induce Haupt to sell his stock at an artificially low price. From the special verdict form, it is apparent that the jury reached that conclusion even without the proffered evidence.

testimony was based on his theory that certain "fraud triangles" typically underlie fraudulent conduct. His testimony was offered to show that the facts of this case were consistent with these fraud triangles. In excluding the testimony, the trial court expressly found that:

> Albrecht has never been qualified, nor permitted to testify in any court of law regarding his "fraud triangles" theory for discovering *indicia* of fraud. Research into the case law by counsel for the parties and the [c]ourt has failed to locate even a single case in which the "fraud triangles" theory has been adopted as a reliable scientific method in any court of law.

Haupt relies upon *State v. Larsen*, 865 P.2d 1355 (Utah 1993), and *United States v. Cantwell*, No. 01–4171, 2002 U.S.App. LEXIS 9208 (10th Cir. May 15, 2002), to support his argument that Albrecht's testimony was improperly excluded. Neither of these cases supports Haupt's position on appeal.

¶ 32 In *Cantwell*, the trial court allowed a certified fraud examiner to explain a pyramid scheme to the jury. *See* 2002 U.S.App. LEXIS 9208, at *15. The defendant had not been charged with operating a pyramid scheme. *See id.* The testimony was offered on the issue of whether the defendant's conduct constituted a "scheme to defraud," a necessary element of the mail and wire fraud charges brought against him. *Id.* at *21. Under the facts of that case, the Tenth Circuit concluded that the trial court did not abuse its "very broad discretion" in allowing the testimony. *Id.* at *18. Likewise, in *Larsen*, the Utah Supreme Court held only that the trial court did not abuse its discretion in allowing the State's expert to testify that some of the information the defendant omitted from the securities documents provided to the investors could have been important or significant. *See* 865 P.2d at 1363 n. 12 ("We do not suggest that the trial court must allow expert testimony regarding materiality. . . . We simply hold that the trial court did not abuse its discretion in allowing the limited testimony in this case.").

■ ¶ 33 In addition to concluding that the Albrecht testimony did not satisfy the *Rimmasch* inherent reliability test, the trial court also concluded that it was more prejudicial than probative. Again, it was not an abuse of discretion to exclude that testimony. Moreover, because the jury found that the facts here did support a finding that Heaps made fraudulent misrepresentations to Haupt, the exclusion of the evidence, even if in error, was harmless.

## III. Jury Instructions

¶ 34 Haupt contends that a number of the jury instructions were legally incorrect.

### A. Instruction 44

■ ¶ 35 Haupt claims that the second paragraph of Instruction 44 improperly imposes a duty of care on Haupt that was not required. Instruction 44 states:

> Mr. Haupt had the right to rely on the representations made by Mr. Heaps and was not required to make an independent investigation of those facts. However, if Mr. Haupt was presented with facts that should have made it apparent to one of his knowledge and intelligence that he was being deceived, or if he actually discovered something which should have served as a warning that he was being deceived, then Mr. Haupt was required to make his own investigation.
>
> To prevail on a claim of fraud, Haupt must show that he did not heedlessly accept as true whatever was told him, but rather that he exercised such degree of care to protect his interests as would be exercised by an ordinary, reasonable and prudent person under the circumstances. If Haupt failed to exercise reasonable care, he is precluded from holding Heaps or any other person responsible.

Haupt does not dispute that reasonable reliance is a required element of a fraud claim. Instead, he alleges that unless and until the plaintiff receives some information that further investigation is warranted, he or she need do nothing to investigate the facts as represented by the defendant. He contends that because there was no information that should have required further inquiry, the second paragraph of Instruction 44 was error. Haupt's argument begs the question.

It was the purview of the jury to decide whether Haupt's reliance was reasonable in light of all the facts. *See Berkeley Bank for Coops. v. Meibos,* 607 P.2d 798, 801 (Utah 1980); *Conder v. A.L. Williams & Assocs.,* 739 P.2d 634, 638 (Utah Ct.App.1987).

¶ 36 It is correct that in the absence of some warning that something was amiss, Haupt had no duty to investigate. *See Robinson v. Tripco Inv., Inc.,* 2000 UT App 200, ¶ 20, 21 P.3d 219; *Conder,* 739 P.2d at 638. That legal concept was accurately explained in the first paragraph of Instruction 44. The second paragraph of that same instruction accurately states the standard applicable if Haupt was presented with facts that should have put him on notice that he was being deceived.[8] *See Mikkelson v. Quail Valley Realty,* 641 P.2d 124, 126 (Utah 1982). Despite Haupt's protestations to the contrary, there was evidence from which the jury could have found that Haupt was put on notice to make further investigation. Haupt testified that he did not like or trust Heaps, that on several occasions Heaps changed the subject when Haupt attempted to obtain financial information about Authorize.Net, and that the financial information provided at the time of sale included only the first two quarters of that year. It was for the jury to decide whether a person of Haupt's knowledge and experience should have been warned and whether his reliance, under all of the facts and circumstances, was reasonable. Therefore, the inclusion of the second paragraph of Instruction 44 was not error.

### B. Instruction 47

¶ 37 Haupt also complains that the jury should not have been instructed as to the rights of shareholders to inspect and copy financial information relating to the corporation. Haupt does not dispute that Instruction 47 is a correct statement of Utah law. Rather, he asserts that the instruction creates the impression that Haupt was required to investigate the truthfulness of Heaps's representations. As discussed above, Instruction 44 correctly instructed the

jury that Haupt had no obligation to make an independent investigation of any statements made by Heaps unless he was presented with facts that should have been a warning to one of his knowledge and intelligence. It was not error to instruct the jury as to the type of information available to Haupt in the event the jury concluded that Haupt had been warned.

### C. Instructions 45 and 49–53

¶ 38 Haupt also claims that the instructions relating to equity, the business judgment rule, and apportionment of fault were erroneous. In light of the jury's finding that Haupt did not reasonably rely on the misrepresentations that were made by Heaps, it is unnecessary for us to consider these arguments. To prevail on an appeal based on instructions to the jury, this court must find both that the instruction was inaccurate and that there is " 'not a mere possibility, but a reasonable likelihood that the error affected the result.' " *Cheves v. Williams,* 1999 UT 86, ¶ 20, 993 P.2d 191 (quoting *Steffensen v. Smith's Mgmt. Corp.,* 862 P.2d 1342, 1346 (Utah 1993)). Here, it is not reasonably likely that these instructions, whether or not erroneous, affected the result. The business judgment rule instructions and the equity instruction were objectionable to Haupt because they might impose a heavier burden than legally required to prove that Heaps acted fraudulently. Despite these instructions, the jury found that Heaps did make material misrepresentations to Haupt. Furthermore, apportionment of fault was only relevant to damages. Because the jury found in favor of Heaps, no damages were awarded and the instruction had no effect.

### CONCLUSION

¶ 39 For the reasons stated above, we hold that the trial court did not abuse its discretion in excluding Exhibit 96 and the testimonies of Randle, Bramble, and Albrecht. We further hold that the jury instructions, taken as a whole, properly instructed the jury regarding reasonable reliance. The remaining

---

8. At oral argument, counsel for Haupt conceded that if a proper caution had been included reminding the jury that reasonable investigation is required only after warning, the second paragraph of Instruction 44 did accurately state the law.

instructions Haupt challenges relate to issues decided in his favor or not reached by the jury. Therefore, even if those instructions were incorrect, which we do not decide here, any error was harmless. The award in favor of Heaps is affirmed.

¶ 40 WE CONCUR: JAMES Z. DAVIS and WILLIAM A. THORNE JR., Judges.